AMERICAN HISTORICAL
ASSOCIATION, et al.,
Plaintiffs,

v.

Trudy PETERSON, in her official
capacity as Acting Archivist of
the United States, and

George Bush, Defendants.

Civ. No. 94–2671 (CRR).

United States District Court,
District of Columbia.

Feb. 27, 1995.

As Amended March 14, 1995.

Michael E. Tankersley of Public Citizen Litigation Group, Washington, DC, argued the case for the plaintiffs. With him on the briefs was Alan B. Morrison of Public Citizen Litigation Group, Washington, DC.

Richard G. Lepley of the Dept. of Justice, Civ. Div., Washington, DC, argued the case for the defendants. With him on the briefs were Frank W. Hunger, Asst. Atty. Gen., Eric Holder, Jr., U.S. Atty., and Elizabeth A. Pugh of the Dept. of Justice, Civ. Div., Washington, DC.

## TABLE OF CONTENTS

INTRODUCTION ................................................. 1303
BACKGROUND ................................................. 1304
 A. The Bush–Wilson Agreement ..................................... 1304
 B. The Presidential Records Act ................................... 1306
DISCUSSION ................................................. 1308
 I. THE COURT FINDS THAT THIS ACTION IS NEITHER
 TECHNICALLY MOOT NOR SUBJECT TO DISMISSAL ON
 PRUDENTIAL GROUNDS ..................................... 1308
 A. This Action is Not Moot Because the Bush–Wilson Agreement Remains
 in Place and the Correspondence Proffered by the Government Does
 Nothing to Alter the Agreement ................................. 1308
 B. The Doctrine of Prudential Mootness Does Not Apply to the Instant Suit ....1312
 II. THE COURT FINDS WITHOUT MERIT THE DEFENDANTS'
 ARGUMENTS AGAINST JUDICIAL REVIEW ......................... 1312
 A. The Court of Appeals' Decisions in Armstrong I and Armstrong II
 Do Not End the Inquiry as to Whether Judicial Review of the
 Bush–Wilson Agreement is Available ............................. 1312
 B. The Archivist's Compliance with the PRA is at Issue Here and is Subject
 to Judicial Review ........................................... 1315
 III. THE BUSH–WILSON AGREEMENT IS UNLAWFUL .................... 1318
 A. The Bush–Wilson Agreement Violates the Presidential Records Act ....... 1318
 B. The Former Archivist's Decision to Enter into the Agreement
 Notwithstanding the PRA was Arbitrary, Capricious, an Abuse of
 Discretion, and Contrary to Law ................................. 1320
 C. The Bush–Wilson Agreement Conflicts with Article II of the Constitution ....1320
CONCLUSION ................................................. 1322

EXHIBIT A: "Memorandum of Agreement Between National Archives and Records and Administration, and National Security Council, and Office of Administration and George Bush" (Jan. 20, 1993)

EXHIBIT B: Letter from Trudy Huskamp Peterson, Acting Archivist of the United States, to James W. Cicconi (Jan. 27, 1995)

EXHIBIT C: Letter from James W. Cicconi to Trudy Huskamp Peterson, Acting Archivist of the United States (Jan. 30, 1995)

## INTRODUCTION

CHARLES R. RICHEY, District Judge.

This matter initially came before the Court on the Plaintiffs' Motion for a Preliminary Injunction. By Order entered February 7, 1995, the Court granted, without objection, the Plaintiffs' request that said Motion be consolidated with a hearing on the merits, pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure. Before the Court at this time are the Plaintiffs' Motion for Summary Judgment and the Defendants'[1] Motion to Dismiss or, in the alternative, Motion for Summary Judgment, along with the respective Oppositions and Replies thereto. A hearing on the same was held on February 22, 1995. Upon careful consideration of the pleadings, the applicable law, and the entire record herein, the Court determines that the Plaintiffs' Motion for Summary Judgment shall be granted, and the Defendants' dispositive Motion shall be denied.

The question presented by the instant suit is whether the so-called "Bush–Wilson Agreement," which provides that certain electronic Presidential records be treated as former President George Bush's personal records subject to his control, is consistent with the Presidential Records Act and the Constitution.

In particular, the Plaintiffs ask the Court to declare null and void a Memorandum of Agreement between former President Bush and former Archivist Don W. Wilson ("Bush–Wilson Agreement" or "Agreement"), signed on the day former President Bush left office, which purports to give former President Bush exclusive control over electronic records of the Executive Office of the President created during former President Bush's term in office. The Plaintiffs further ask the Court to enjoin the Acting Archivist from implementing the Bush–Wilson Agreement. As grounds therefor, the Plaintiffs assert that the Agreement violates the Presidential Records Act ("PRA"), 44 U.S.C. §§ 2201–07, as well as Article II of the Constitution, and that the decision by the Archivist to enter into that Agreement was arbitrary, capricious, an abuse of discretion, and contrary to law under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.

In response, the Defendants contend that the Court lacks jurisdiction over the Plaintiffs' request for injunctive and declaratory relief because each component of the Plaintiffs' request has been mooted by virtue of certain correspondence proffered by the government. The Defendants further assert that, even if this action were not technically moot, it should be dismissed under the doctrine of prudential mootness. Finally, the Defendants argue that judicial review of the former President's decision to enter into the Bush–Wilson Agreement is unavailable, and that the Plaintiffs cannot obtain relief under Article II of the Constitution. The Defendants do not address, however, the merits of the Plaintiffs' challenge to the Agreement itself under the PRA, or their challenge to the former Archivist's actions under the APA.

The Court finds that the case is not moot, and that the former Archivist's actions with respect to the Agreement are subject to judicial review. On the merits, the Court further finds that the Bush–Wilson Agreement cannot be sustained under the PRA and Article II of the Constitution, and that the former Archivist's decision to enter into the Agreement, notwithstanding the provisions of the PRA, was arbitrary, capricious, an abuse of discretion, and contrary to law. The Court

---

1. The sole Defendant named in the original Complaint, filed December 13, 1994, was Trudy Peterson in her official capacity as Acting Archivist of the United States. Complaint for Declaratory and Injunctive Relief ¶ 12. On February 7, 1995, the Plaintiffs filed an Amended Complaint, naming George Bush as an additional Defendant, pursuant to Rule 19(a)(2) of the Federal Rules of Civil Procedure. Amended Complaint for Declaratory and Injunctive Relief ¶ 13. Pursuant to a request by the Court, Richard G. Lepley of the Civil Division of the Department of Justice represented to the Court at a status conference on February 24, 1995 that he had the authority to state that former President Bush adopts all of the Federal Defendant's arguments and positions in support of her Motion to Dismiss or, in the alternative, Motion for Summary Judgment, and in opposition to the Plaintiffs' Motion. Accordingly, former President Bush, as a Defendant in this case, will be bound by the judgment issued herein.

shall therefore issue an injunction prohibiting the Acting Archivist from implementing the Bush–Wilson Agreement, and shall direct her to process the Presidential records purportedly governed by the Agreement in accordance with the PRA.

## BACKGROUND

The Plaintiffs [2] are historians, researchers, librarians, and journalists who seek in this action "to enforce the central mandate of the [PRA], namely, that Presidential records shall no longer be treated as personal property of the President but as records of the United States, and that they shall be made available to the public under the standards established by law." Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction, at 1.

In a related case, *Armstrong v. Executive Office of the President,* 810 F.Supp. 335 (D.D.C.1993), *aff'd in part and reversed in part,* 1 F.3d 1274 (D.C.Cir.1993), this Court held that electronic records created by the "agency" components of the Executive Office of the President are subject to the Federal Records Act ("FRA"), 44 U.S.C. §§ 2101–2118, 2901–2910, 3101–3107 & 3301–3324, and enjoined the Archivist to take all necessary steps to preserve the electronic Federal records generated by the executive agencies on these systems. 810 F.Supp. at 350. This injunction, however, did not apply to Presidential records that are subject to the PRA rather than the FRA;[3] such Presidential records are at issue in the instant litigation.

### A. The Bush–Wilson Agreement

During the administration of former President George Bush, components of the Executive Office of the President ("EOP") used office automation systems to create, store, and retrieve information in electronic format.[4] Between January 19, 1993, and January 28, 1993, approximately 5,000 magnetic tapes, more than 140 disk drives, and one floppy disk that contain memoranda, documents, scheduling calendars and other information recorded in electronic format by EOP staff during the Bush Administration were transferred to the physical custody of the Archivist. The materials transferred include "Presidential records," as that term is defined in 44 U.S.C. § 2201(2). The Presidential records on the tapes were generated by individuals in the White House Office and the Office of Policy Development, as well as in other offices and components of the EOP which solely advise the President. Over 300 individuals from the White House Office and the Office of Policy Development used the EOP's automated office systems.

On January 19, 1993, the last day of the Bush Administration, the Archivist of the United States signed a "Memorandum of Agreement" ("Bush–Wilson Agreement") with then–President George Bush, then–Executive Secretary of the National Security Counsel ("NSC") William F. Sittman, and then–Acting Director of the Office of Administration ("OA") Phillip D. Larsen, concerning the disposition of disks and backup tapes containing information from the EOP office automation systems that were transferred to the Archivist between January 19 and January 28, 1993. The Bush–Wilson Agreement is attached hereto as Exhibit A and made a part hereof. The electronic materials subject to the Agreement are identified in three

---

**2.** The Plaintiffs include the American Historical Association, the American Library Association, the Center for National Security Studies, the National Security Archive, the Organization of American Historians, Public Citizen, Inc., journalist Scott Armstrong, and Eddie Becker. Amended Complaint for Injunctive and Declaratory Relief.

**3.** *See Armstrong v. Executive Office of the President,* Order of January 14, 1993, at 3 ("nothing in this Court's Opinion and Orders of January 6, 1993 and January 11, 1993 dealt with President

Bush's personal papers or any other presidential or non record material. Nor did the Court restrict the President's ability to deal with *presidential* material or non-records.").

**4.** In accordance with Local Rule 108(h), each party filed a statement of material facts to which there is no genuine dispute, along with a response to the opposing party's statement. The parties disagree as to whether particular facts are "material," but there appears to be no dispute as to the accuracy of the facts set forth in this Memorandum Opinion.

Schedules, Schedules A, B, and C.[5] Exh. A at 6–8.

According to the Defendants, the injunction issued by this Court in the *Armstrong* case, although limited to exclude Presidential and non-record material, made it necessary for the former President and the Archivist to develop independent provisions for the handling of material that was physically attached to protected federal record material, but not otherwise subject to the injunction.[6] The Defendants assert that the *Armstrong* injunction had the practical effect of preventing disposition of Presidential records on the tapes otherwise subject to the injunction, and that the Memorandum Agreement was drafted and executed in order to allow former President Bush to exercise his authority to create, manage and dispose of Presidential records at the close of the Bush Administration. *Id.* at 8. At the hearing held on February 22, 1995, however, counsel for the Defendants represented that the purpose of the Agreement was to preserve former President Bush's rights to his "personal" records after he left office. Transcript of Feb. 22, 1995 hearing at 5–6 (hereinafter "Tr.").

Section I.5 of the Bush–Wilson Agreement provides that "George Bush shall retain exclusive legal control over all Presidential information, and all derivative information in whatever form, contained on the materials"

transferred to the Archivist. Section VI.1 of the Agreement defines "Presidential information" as

> information contained on the materials, that was created or received by the President, any individual or unit in the Executive Office of the President (including, but not limited to, all staff of the White House Office and the Office of Policy Development) whose sole function is to advise and assist the President, and/or the NSC staff in their functions as advisors and assistants to the President.

All "Presidential records" on the tapes and disks, as defined by § 2201(2) of the PRA, fall within this definition of "Presidential information" (see below). In addition, Section III.3 of the Agreement provides that "Presidential information on the materials shall be disposed of in accordance with the instructions of George Bush or his designee."

Under Section II.4.a of the Bush–Wilson Agreement, before providing access to any non–Presidential information on the transferred materials to the NSC, OA or any other "third party," the National Archives and Records Administration ("NARA") must segregate Presidential and non–Presidential information pursuant to procedures approved in advance by other parties, and

---

**5.** Schedule A covers backup tapes and personal computer hard drives containing data from electronic communications systems used by the National Security Counsel and White House Situation Room staff during the Bush Administration. These NSC backup tapes are subject to this Court's injunction in *Armstrong v. Executive Office of the President,* 810 F.Supp. 335 (D.D.C. 1993), and were recently declared subject to the Federal Records Act to the extent that they were not created solely to advise and assist the President. *Armstrong v. Executive Office of the President,* Civ. No. 89–142, 1995 WL 77999, Memorandum Opinion and Order entered February 14, 1995.

Schedule B covers all backup tapes from an electronic communications system known as OA All–in–One or OASIS, which was operated by the Office of Administration for the use of staff of the EOP during the Bush Administration. The OASIS backup tapes contain both Presidential and Federal records, and are subject to this Court's injunction to the extent that they contain Federal records. *Armstrong v. EOP,* 810 F.Supp. at 349. Approximately 5,000 OASIS backup tapes cov-

ered by Schedule B were transferred to the custody of the Archivist at the end of the Bush Administration.

Schedule C covers hard disks from personal computers used by personnel of the White House Office and the Office of Policy Development during the Bush Administration. These hard drives are not subject to the injunction in *Armstrong v. EOP* but, as explained below, are subject to a subpoena issued by the Independent Counsel investigating whether officials in the Bush Administration EOP were improperly involved in the search of passport files of then-presidential candidate William Jefferson Clinton during the 1992 campaign. The Federal Bureau of Investigation has custody of the hard drives identified in Schedule C, but they will be deposited with the National Archives and Records Administration ("NARA") at the end of the Independent Counsel's investigation.

**6.** Defendants' Reply to Opposition to Motion to Dismiss or, in the alternative, for Summary Judgment, at 7 [hereinafter "Defendants' Reply"].

[s]uch procedures shall include a provision by which NARA performs an initial review of the materials (or the responsive portions thereof), identifies Presidential materials, then permits George Bush or his designee to review the materials to ensure that all Presidential materials have been properly identified by NARA.

These requirements do not apply in the case of a subpoena or court order requiring access to Presidential information, to the extent precluded by court order, to requests for information by an independent counsel, and whenever the parties agree to waive the requirements. Exh. A. at 3, II.4.c.

Schedule D of the Agreement is a letter dated January 19, 1993 from Independent Counsel Joseph E. diGenova to C. Boyden Gray, Counsel to the President, memorializing an agreement concerning the disposition of certain materials responsive to a grand jury subpoena served on The White House on January 15, 1993. As these materials are otherwise encompassed by the Bush–Wilson Agreement, Section I.7. of the Agreement provides that, at the conclusion of the investigation by the Independent Counsel Joseph diGenova, the materials in Schedule C, namely, hard disks used by personnel of the White House Office and Office of Policy Development, "shall be transferred to the NARA as personal records of George Bush." Transfer of the hard drives may occur as early as March 1, 1995. Defendants' Exhibit C, Declaration of Michael Zeldin ¶ 2.

By letter dated January 27, 1995 to Mr. James W. Cicconi, Acting Archivist Trudy Peterson stated her "understanding of President Bush's intention that the National Archives treat the [materials described in Schedules A, B and C of the Bush–Wilson Agreement] in accordance with the provisions of the Presidential Records Act of 1978, 44 U.S.C. §§ 2201–2207." This letter is attached hereto as Exhibit B and made a part hereof.

In a responsive letter dated January 30, 1995, Mr. Cicconi, who identifies himself as "President Bush's designated representative under the Presidential Records Act," states that his letter "constitutes agreement" that the proposed procedures outlined in the Archivist's letter for the review and processing of materials at issue "may be implemented by the National Archives and Records Administration ... consistent with decisions in *Armstrong v. Executive Office of the President* and with the Presidential Records Act." This letter is attached hereto as Exhibit C and made a part hereof.

### B. *The Presidential Records Act*

"History, custom, and usage indicate unequivocally that, prior to [the enactment of the Presidential Records Act], Presidents exercised complete dominion and control over their presidential papers." *Nixon v. United States,* 978 F.2d 1269, 1277 (D.C.Cir.1992). While some Presidents ensured that such papers would pass by descent, others made outright gifts of their papers, often imposing personal restrictions on public access, and a number of Presidents destroyed their records. *Id.* at 1277–80.

"In 1978, Congress prospectively abolished presidential ownership of White House materials with the Presidential Records Act, 44 U.S.C. § 2201 *et seq.*" *Id.* at 1277 n. 19. As the House Report on the PRA states:

The legislation would terminate the tradition of private ownership of Presidential papers and the reliance on volunteerism to determine the fate of their disposition. Instead, the preservation of the historical record of the future Presidencies would be assured and public access to the materials would be consistent under standards fixed in law.

H.R. No. 95–1487, 95th Cong., 2d Sess. § 2 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5732, 5733.

Following his resignation in August 9, 1974, former President Nixon and the Administrator for General Services, Arthur Sampson, entered into an Agreement ("Nixon–Sampson Agreement") whereby "Mr. Nixon agreed to deposit all of his presidential papers with [Mr. Sampson,] for a temporary period, after which certain materials would be donated permanently to the United States." *Nixon,* 978 F.2d at 1271 (footnote omitted). While the integrity of the materials was guaranteed, "Mr. Nixon retained title to his papers and the right to exclude others

from viewing or using the materials...."
*Id.* In 1978, Congress enacted the PRA in part to ban future accords like the Nixon–Sampson Agreement. *See* H.R.Rep. No. 95–1487, 95th Cong., 2d Sess. §§ 5, 8 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5732, 5736, 5739. Accordingly, the PRA declares that:

> The United States shall reserve and retain complete ownership, possession, and control of Presidential records; and such records shall be administered in accordance with the provisions of this chapter.

44 U.S.C. § 2202.

The statute directs the President to "take all such steps as may be necessary to assure that the activities, deliberations, decisions, and policies that reflect the performance of his constitutional, statutory, or other official or ceremonial duties are adequately documented and that such records are maintained as Presidential records...." *Id.* § 2203.

The PRA defines "Presidential records" broadly:

> The term "Presidential records" means documentary materials, or any reasonably segregable portion thereof, created or received by the President, his immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise and assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President.

*Id.* § 2201(2). The definition of "documentary materials" specifically includes any "electronic or mechanical recordations." *Id.* § 2201(1). The legislative history explains that the scope of the term "Presidential records" "is very broad since a great number of what might ordinarily be construed as one's private activities are, because of the nature of the presidency, considered to be of public nature, *i.e.*, they effect the discharge of his official or ceremonial duties." H.R. No. 95–1487, 95th Cong., 2d Sess. §§ 11–12 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5732, 5742–43.

The Act further provides that "personal records," among other items, are exempt from the definition of "Presidential records," but defines the former term narrowly:

> The term "personal records" means all documentary materials, or any reasonably segregable portion thereof, of a purely private or nonpublic character which do not relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President.

*Id.* § 2201(3). Indeed, the legislative history indicates that "an examination of the nature of political activities in which a President becomes involved shows that few are truly private and unrelated to the performance of his duties." H.R. No. 95–1487, 95th Cong., 2d Sess. § 12 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5732, 5743.

The PRA regulates the disposal of Presidential records, both during and after the President's term of office. "During his term of office, the President may dispose of those of his Presidential records that no longer have administrative, historical, informational, or evidentiary value." *Id.* § 2203(c). However, the President must first obtain "the views, in writing, of the Archivist concerning the proposed disposal of such Presidential records." *Id.* § 2203(c)(1). "If the Archivist thinks it advisable, she may notify Congress of the President's intent to dispose of the records; and if the Archivist notifies Congress, the President must submit the disposal schedules to the appropriate congressional committees and wait sixty days before destroying the records." *Armstrong v. Bush,* 924 F.2d 282, 286 (D.C.Cir.1991) ("*Armstrong I*") (citing 44 U.S.C. §§ 2203(c), (d)).

"Somewhat different disposal provisions apply after the President has left office." *Id.* The statute provides that, at the end of the President's term, the Archivist "*shall* assume responsibility for the custody, control, and preservation of, and access to, the Presidential records of that President." *Id.* § 2203(f)(1) (emphasis added). The Archivist has "an affirmative duty to make such records available to the public as rapidly and completely as possible consistent with the provisions of the Act." *Id.* After giving notice in the Federal Register, the Archivist may dispose of the records that have "insufficient administrative, historical, informational, or evidentiary value to warrant their continued preservation." *Id.* § 2203(f)(3). "Publication of such notice shall constitute a final

agency action" for purposes of judicial review under the APA. *Id.*

The PRA also sets forth the precise parameters of the President's authority to impose restrictions on access to Presidential records following his term in office. Most Presidential records become available to the public under the Freedom of Information Act, 5 U.S.C. § 522 ("FOIA"), no later than five years after the Archivist obtains custody. 44 U.S.C. § 2204(b), (c). Before leaving office, however, the President may impose additional restrictions for a specified period, not to exceed twelve years, on particular categories of documents. Such categories include, for example, documents that are classified in the interest of national defense or foreign policy, documents that relate to appointments to Federal office, or documents that relate to confidential communications between the President and his advisors. *Id.* § 2204(a)(1). However, "[t]hese are the only categories of records of his administration to which the outgoing President may restrict access. He is given no authority to impose additional restraints beyond those itemized in subsection [2204](a)." H.R. No. 95–1487, 95th Cong., 2d Sess. § 14, (1978), *reprinted in* 1978 U.S.C.C.A.N. 5732, 5745. Moreover, it is the Archivist, not the President, who makes the final "determination whether access to a Presidential record or reasonably segregable portion thereof shall be restricted" under the restrictive provisions available to the outgoing President. 44 U.S.C. § 2204(b)(3).

## DISCUSSION

### I. THE COURT FINDS THAT THIS ACTION IS NEITHER TECHNICALLY MOOT NOR SUBJECT TO DISMISSAL ON PRUDENTIAL GROUNDS

**A. This Action is Not Moot Because the Bush–Wilson Agreement Remains in Place and the Correspondence Proffered by the Government Does Nothing to Alter the Agreement**

■ The Defendants urge the Court to dismiss this case as moot, asserting that correspondence exchanged in January of this year, attached hereto as Exhibits B and C, "evidence[s] agreement between the Archivist and President George Bush that all processing of materials identified in Schedules A, B and C of the January 1993 Memorandum Agreement will be in accordance with the provisions of the Presidential Recor[ds Act] (sic)...." [7] The Defendants contend that, in light of this "agreement," "there is no longer a 'live controversy' and the Court lacks subject matter jurisdiction to render what would be an advisory opinion on either the injunctive or the declaratory relief sought." *Id.* at 2.

The Bush–Wilson Agreement, however, remains intact. The Court therefore cannot agree with the Defendants' suggestion that the letters by the Archivist and the so-called designee of former President Bush indicate "*unequivocally* and expressly, that the Presidential Records Act governs all processing of the non-federal materials identified in the Memorandum Agreement." *Id.* at 5 (emphasis added). As the Plaintiffs suggest, it is precisely because the "agreement" to process the records at issue in accordance with the PRA is *not* unequivocal or, under the applicable standard, irrevocable, that the Court cannot declare this action moot. At bottom, the Archivist and former President Bush's designee have merely provided a series of letters evidencing an *intent* to process the records at issue pursuant to the PRA. Thus, the Defendants cannot seriously be heard to argue that such letters unequivocally end this case or that, by virtue of the letters, the Archivist is bound to process the records under the PRA, notwithstanding any future direction otherwise; indeed, she has refused to enter into a consent decree to that effect. As what the Plaintiffs seek is just such a binding judgment or agreement, the Court finds that a case or controversy does exist here.

The applicable law strongly supports the Court's conclusion that this action is not

7. Defendants' Memorandum in Support of Motion to Dismiss or, in the alternative, Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment, at 1 [hereinafter "Defendants' Motion"].

moot. The doctrine of mootness is premised upon the notion that "[a] federal court is constitutionally forbidden to render advisory opinions or 'to decide questions that cannot affect the rights of litigants in the case before them.'" *Better Government Association v. Dep't of State*, 780 F.2d 86, 90–91 (D.C.Cir.1986) (quoting *North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971)). In *Los Angeles v. Davis*, 440 U.S. 625, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979), the Supreme Court established a two-pronged test for determining whether a case is moot: "a dispute is not moot unless (1) there is no reasonable expectation that the alleged violation will recur and (2) 'interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.'" *Reeve Aleutian Airways, Inc. v. United States*, 889 F.2d 1139, 1142–43 (D.C.Cir.1989) (quoting *Davis*, 440 U.S. at 631, 99 S.Ct. at 1383)).

In this case, the Court finds that, because the Bush–Wilson Agreement remains in place, neither prong of the *Davis* test is met. First, even if the Archivist processes the documents under the PRA, as the correspondence suggests she will do, former President Bush still purportedly retains "exclusive legal control" over the materials under the Agreement, notwithstanding the provisions of the PRA. In fact, by affording the Acting Archivist permission, through his so-called designee, to implement NARA's "proposals" concerning review and processing of the records under the PRA, former President Bush confirmed his purportedly "exclusive legal control" over the Archivist's treatment of the records under the Agreement. In view of the Plaintiffs' allegation that this represents a continuing violation of the law, the Court cannot find that this matter is moot.

Moreover, there is no assurance that the Agreement will not give rise to further alleged violations of the PRA with respect to particular records. The Agreement takes the disposition of the Presidential records at issue out of the explicit confines of the PRA and places it into the hands of former President George Bush, now a private citizen. Although former President Bush's "designee" has represented his agreement to sanction the Archivist's processing of these Presidential records pursuant to the mandates of the PRA, nothing in the correspondence precludes former President Bush from changing his mind and exercising his purportedly "exclusive legal control" in a manner inconsistent with the PRA, thereby leaving the door open for violations of that statute with respect to particular records. Indeed, the Defendants acknowledge as much when they state, in response to the Plaintiffs' argument that the Archivist and the former President "can later undo" what was done in the 1995 correspondence, that "the fact that all agreements can later be modified by the parties that execute them does not render those agreements meaningless." Defendants' Reply, at 12. Because this fact does, however, render the Plaintiffs susceptible to injury, this case is not moot.

Moreover, courts have repeatedly held that a defendant's defense of challenged official conduct "makes it more likely that [the plaintiff] will be subject to the procedures" in the future. *Reeve*, 889 F.2d at 1143. In *City of New Haven v. United States*, 809 F.2d 900, 904 (D.C.Cir.1987), the Court of Appeals held that, even where the plaintiffs' challenge to specific applications of a statute had been rendered moot, their facial challenge to the statute was not moot because the "Executive Branch had not disavowed reliance on the challenged statute," and the allegedly unlawful statute could be relied upon by officials in the future. "[W]hen a complaint identifies official conduct as wrongful and the legality of that conduct is vigorously asserted by the officers in question, the complainant may justifiably project repetition, albeit in a different setting, and involving different official actors." *Doe v. Harris*, 696 F.2d 109, 113 (D.C.Cir.1982).

Here, the Defendants have neither repudiated the Bush–Wilson Agreement nor conceded the Plaintiffs' claim that the Agreement is unlawful. Indeed, the Defendants characterize the Agreement as memorializing former President Bush's "*right* to guarantee a later review of *presidential* materials...." Defendants' Motion, at 18 (emphasis added). Nowhere, however, does the PRA guarantee

a former President any right to control Presidential records after leaving office.

Moreover, at oral argument on February 22, 1995, counsel for the Defendants stated that the purpose of the "unartfully" drafted Agreement was not to assert control over Presidential records, but was to preserve former President Bush's right to his *personal* records. Tr. at 14. This statement flatly contradicts the position set forth in the Defendants' papers that the Agreement preserved former President Bush's right to guarantee later review of Presidential records. In addition, the claim that the Agreement seeks only to preserve personal records is belied by the terms of the Agreement itself, under which "Presidential information" is broadly defined as

> information, contained on the materials, that was created or received by the President, any individual or unit in the Executive Office of the President, (including, but not limited to, all staff of the White House Office and the Office of Policy Development) whose sole function is to advise and assist the President, and/or the NSC staff in their functions as advisers and assistants to the President.

Exh. A at 5, VI.1. Under no stretch of the imagination could one seriously argue that this definition was merely "unartfully" drafted but intended to cover only personal records of former President George Bush. Tr. at 14. Counsel for the Defendants asserted that the "unartful" language stems from the fact that in 1993, when the Agreement was drafted, the government did not have the benefit of the most recent *Armstrong* decisions before it. Tr. at 6. The PRA itself, however, has been in existence since 1978, and defines with clarity the terms "Presidential records" and "personal records," the latter including only those records of a "purely private or nonpublic character which do not relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President." 44 U.S.C. § 2201(3). To say that the

Bush–Wilson Agreement was designed to preserve former President Bush's right to this limited category of records, when it covers on its face thousands of tapes, over 140 disk drives, and a floppy disk containing information recorded by various White House, Office of Policy Development, and other EOP staff throughout his Administration, is disingenuous at best. Thus, the Court finds that the Defendants' failure to disavow reliance on the Agreement, as written to cover "Presidential information," renders it "hardly apparent" that the rights of the parties and the public are not still effected by it. *Doe,* 696 F.2d at 112.

■ Second, and for similar reasons, the Defendants have failed to demonstrate that the effects of the alleged violation have been completely and irrevocably eradicated. Indeed, they cannot, as the Agreement has not been abrogated, rescinded, nullified, or superseded. The Supreme Court has repeatedly found it a " 'well settled' " rule that 'a defendant's voluntary cessation of the challenged practice does not deprive a federal court of its power to determine the legality of the practice.' " *Northeastern Florida Chapter of the Associated General Contractors of America v. City of Jacksonville,* —— U.S. ——, ——, 113 S.Ct. 2297, 2300, 124 L.Ed.2d 586 (1993) (quoting *City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 289, 102 S.Ct. 1070, 1074–75, 71 L.Ed.2d 152 (1982)). *See also United States v. W.T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953); *City of New York v. Baker,* 878 F.2d 507, 511 (D.C.Cir.1989), *reh'g denied,* 888 F.2d 134 (D.C.Cir.1989). Thus, in *City of Jacksonville,* the Supreme Court found that repeal of a challenged ordinance did not render the case moot because the repeal "would not preclude [the defendant] from reenacting precisely the same provision if the District Court's judgment [finding the provision unconstitutional] were vacated." *Id.*

Such is the case here.[8] The letters of intent proffered by the government do not

---

8. In fact, the case for evaluating the legality of the Bush–Wilson Agreement is even stronger here as, unlike in *City of Jacksonville,* there has been no repeal of the challenged Agreement.

The Defendants assert, however, that the "voluntary cessation" exception does not apply because the Archivist never initially took the position that the provisions of the PRA did not apply to the materials at issue. Defendants' Motion, at

abrogate former President Bush's purported authority under the Agreement to direct the Archivist to process the materials at issue in any manner, even in a manner inconsistent with the PRA. It is the fact that the terms of the Agreement purport to afford former President Bush this continuing authority to dictate the destiny of certain Presidential records that, in the Plaintiffs' view, gives rise to a past, present, and ongoing violation of the law. Accordingly, the Court finds that, with the Agreement in place, the Defendants cannot show that the effects of the alleged violation have been completely and irrevocably eradicated. As the Plaintiffs aptly observe, "[t]he Acting Archivist may not credibly maintain that she intends to comply with the PRA *and* that the Bush–Wilson Agreement remains in effect because the Agreement creates rights and obligations that are in direct and irreconcilable conflict with the PRA." [9]

The Defendants rely heavily on *Committee in Solidarity with the People of El Salvador v. Sessions*, 929 F.2d 742 (D.C.Cir.1991) ("*CISPES*") to support their contention that the instant case is moot. In *CISPES*, the plaintiffs sought an injunction requiring the FBI to transfer files pertaining to CISPES to the National Archives. The Court of Appeals held that the FBI's voluntary agreement to transfer the files rendered the case moot, as the court "would have granted no further relief if plaintiffs had prevailed on the merits." *Id.* at 744. The plaintiffs also sought a declaratory judgment, but the Court held that the plaintiffs' challenge to the constitutionality of the FBI investigation alone could not satisfy the case or controversy requirement.

*CISPES*, however, is readily distinguishable from the instant case because, with the Bush–Wilson Agreement intact, the Plaintiffs have not received the relief they seek through the correspondence submitted by the government. Unlike in *CISPES*, the purpose of the declaratory judgment sought here is to nullify an Agreement which purports to place the Archivist under the direction and control of former President Bush, notwithstanding the mandate of the provisions of the PRA governing disposition of Presidential records following a term in office. In spite of the 1995 correspondence, the challenged Agreement remains in place, so the case is not moot. *Cf. Preiser v. Newkirk*, 422 U.S. 395, 402, 95 S.Ct. 2330, 2334–35, 45 L.Ed.2d 272 (1975) (prisoner's constitutional challenge to transfer was mooted when prisoner was returned to original facility).

Further, in *CISPES*, the FBI investigation was terminated with the Director testifying that "the investigation should never have been initiated." *Id.* at 743. Here, the government maintains that the Agreement comports with the law, thereby subjecting the Plaintiffs to potential future harm if the Agreement is indeed unlawful. Accordingly, the Court finds that the challenge at bar is

---

8. As the Plaintiffs document in detail, however, this claim is belied by prior statements made on behalf of the Archivist and the NARA. *See* Plaintiffs' Opposition, at 10–12.

For example, during a presentation to the staff of the NARA in 1993, General Counsel for NARA stated that there was "a need for an agreement for these materials" because "this was neither fish nor fowl. This, from our point of view, was not Presidential record, it was not Federal record. It was in a class by itself, these, what were backup tapes...." Plaintiffs' Exh. 29 (Transcript of Presentation of the Staff of the National Archives and Records Administration, Feb. 26, 1993, at 40).

Moreover, in a Memorandum filed in *Armstrong v. Executive Office of the President*, the Acting Archivist, through the same counsel representing her in this action, asserted:

Since the Presidential information at issue has not been designated by President Bush as

"Presidential records" under the PRA, he retained the discretion to dispose of it as he saw fit, including through transfer to the Archivist subject to restrictions.

Plaintiffs' Exh. 30 (Defendants' Memorandum of Points and Authorities in Opposition to Plaintiffs' Combined Motions to Show Cause, at 43 n. 37 (April 19, 1993)).

Accordingly, the Court is unpersuaded by the Defendants' assertion that cases addressing the voluntary cessation of allegedly illegal activity are inapplicable here, as it is clear that the Archivist has taken the position that the PRA does not apply to the records at issue.

9. Plaintiffs' Reply in Support of Motion for Summary Judgment and Opposition to Defendant's Motion to Dismiss and, in the alternative, for Summary Judgment [hereinafter "Plaintiffs' Opposition"], at 13.

not subject to dismissal on mootness grounds.

· *Clarke v. United States,* 915 F.2d 699 (D.C.Cir.1990), which the Defendants cite in their Reply brief as compelling authority to the contrary, does not lead to the opposite conclusion. In that case, the district court had issued a declaratory judgment that a congressional act that conditioned funding on the District of Columbia's enactment of certain legislation violated the plaintiffs' First Amendment rights. Upon the expiration of the funding statute, the government filed a motion suggesting that the case was moot and urging that this Circuit's panel decision upholding the district court's determination be vacated. On appeal, the plaintiffs argued that the matter was not moot because vacating the district court's judgment would leave open the possibility of prosecution under a statute forbidding the expending of government funds without the authorization of Congress. The Court of Appeals, en banc, held that the case was moot and that the voluntary cessation exception did not apply.

Critical to the Court's finding that the case was not moot was the government's representation at oral argument that, not only would there be no prosecution, but that "the existence of a judgment during that time would be a complete and adequate defense to any prosecution." *Id.* at 701 (internal quotation marks omitted). The Court observed that "a federal judgment, later reversed or found erroneous, is a defense to a federal prosecution for acts committed while the judgment was in effect." *Id.* at 702. Thus, in *Clarke,* the district court judgment had the effect of law protecting the plaintiffs from the behavior the plaintiffs feared. Because there is no such judgment here, *Clarke* does not, as the Defendants assert, "control[ ] this case four square...." Tr. at 8.

Moreover, the Court of Appeals emphasized that the voluntary cessation exception did not apply in *Clarke* because "non-reenactment of a one-time condition that expired of its own terms [before the dispute arose] cannot be viewed as cessation of conduct." *Id.* at 705. Here, in contrast, the 1995 correspondence was executed after the Plaintiffs filed the Complaint and in direct response to

this litigation challenging the Bush–Wilson Agreement. *See* Exh. B at 1 ("questions have been raised in *American Historical Association v. Peterson* ... regarding the Archivist's handling of certain materials"). Accordingly, the Court finds that *Clarke* is not dispositive of the mootness question here, and that the voluntary cessation exception does apply.

**B. The Doctrine of Prudential Mootness Does Not Apply to the Instant Suit**

■ The Defendants further argue that dismissal of this case is warranted under the doctrine of prudential mootness, "a facet of equity." *Penthouse International, Ltd. v. Meese,* 939 F.2d 1011, 1019 (D.C.Cir.1991), *cert. denied,* 503 U.S. 950, 112 S.Ct. 1513, 117 L.Ed.2d 650 (1992). This doctrine, which involves "not the power to grant relief but the court's discretion in the exercise of that power," applies when a given controversy, though "not actually moot, is so attenuated that considerations of prudence and comity for coordinate branches of government counsel the court to stay its hand, and to withhold relief it has the power to grant." *Chamber of Commerce v. United States Dep't of Energy,* 627 F.2d 289, 291 (D.C.Cir.1980). The Defendants assert that, even if the case were technically alive, the 1995 correspondence confirming former President Bush's intention that the records be treated under the PRA renders dismissal appropriate under the more relaxed standard of prudential mootness. The Court disagrees.

As the Court of Appeals for this Circuit has recognized, the "'attenuation' argument" is persuasive "where the challenged practice had been withdrawn or was undergoing substantial revision, so that the reviewing court could not be certain of the regulation's ultimate form." *Reeve,* 889 F.2d 1139, 1144. *See also Community for Non–Violence v. Hess,* 745 F.2d 697, 701 (D.C.Cir.1989). As in *Reeve,* however, this Court is faced with "no such difficulty here." *Reeve,* 889 F.2d at 1144. Rather, the Bush–Wilson Agreement was signed over two years ago, and has been neither withdrawn nor revised. Moreover, unlike in the cases the *Reeve* Court discuss-

es, the Plaintiffs would not necessarily be afforded sufficient opportunity to renew their challenges should an unlawful execution of the Agreement be kept secret from the public, a possibility not foreclosed by the Bush–Wilson Agreement, or if records were improperly destroyed prior to the reinstitution of court proceedings. *Cf. Chamber of Commerce*, 627 F.2d at 292 ("ample opportunity" to renew complaint); *Hess*, 745 F.2d at 702 (same). Accordingly, the Court finds that there is no "prudential" justification for declining to assess the lawfulness of the Agreement.

## II. THE COURT FINDS WITHOUT MERIT THE DEFENDANTS' ARGUMENTS AGAINST JUDICIAL REVIEW

### A. The Court of Appeals' Decisions in *Armstrong I* and *Armstrong II* Do Not End the Inquiry as to Whether Judicial Review of the Bush–Wilson Agreement is Available

■ The Court of Appeals for this Circuit has held that "the PRA precludes judicial review of the President's record creation and management decisions." *Armstrong I*, 924 F.2d at 297. Later, however, in *Armstrong v. Executive Office of the President*, 1 F.3d 1274, 1293 (D.C.Cir.1993) ("*Armstrong II*"), the Court rejected the government's urging that "the court give this language the broadest reading possible, holding in effect that we may not review any guidelines that purport to implement the PRA or deal with asserted presidential records." Rather, the Court stated that "[t]he *Armstrong I* opinion does *not* stand for the unequivocal proposition that all decisions made pursuant to the PRA are immune from judicial review." *Id.* (emphasis added).

In particular, the *Armstrong II* Court held that, while "those decisions that involve materials that are truly presidential records are immune from judicial review," *Armstrong I*

did not hold "that the President could designate any material he wishes as presidential records, and thereby exercise 'virtually complete control' over it ... notwithstanding the fact that the material does not meet the definition of 'presidential records' under the PRA." *Id.* at 1293–94 (citations omitted). Thus, the Court found that judicial review of the guidelines outlining what is and what is not a "presidential record" is available. *Id.* at 1294.

In the instant case, the Defendants argue that *Armstrong I* and *Armstrong II* stand for the proposition that "discretionary Presidential decisions alleged to be in excess of statutory authority are nonreviewable, whether implemented by the President or at his direction." Defendants' Motion, at 14. Accordingly, the Defendants further assert that "President Bush's decision during his Administration[10] to retain nominal control over the materials identified in the Memorandum Agreement ... was a discretionary decision under the PRA," and thus not subject to judicial review. *Id.* at 15–16.

While, as further explained below, the Court finds that this matter is subject to judicial review because the Archivist's compliance with the PRA is reviewable, the Court first observes that the Defendants are incorrect in reading *Armstrong I* and *Armstrong II* to preclude any review of any aspect of the Bush–Wilson Agreement, such that this action warrants dismissal.

First, the Defendants argue, in essence, that former President Bush's decision to denominate categories of Presidential records as "personal records" subject to his control following his term in office is not subject to judicial review. Under *Armstrong II*, however, guidelines "describing which existing records will be treated as presidential records in the first place" are subject to judicial review. *Armstrong II*, 1 F.3d at 1294. Indeed, the legislative history makes clear that "[d]efining the types of documentary materials falling within the ambit of either 'presi-

---

**10.** The Court observes that a question of fact remains as to when former President Bush signed the Agreement. As Plaintiffs' counsel argued at the hearing, the Agreement is signed by George Bush, without any reference to him being President of the United States, and without any indication that his signing the Agreement was a Presidential act. Further, the Agreement is not on official White House stationary, and does not indicate the time of day the document was executed. *See* Tr. at 33.

dential' or 'personal' records is of primary importance to the act. The definitions of these terms must be both *mutually exclusive* and all encompassing." H.R. No. 95–1487, 95th Cong., 2d Sess. § 11 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5732, 5742 (emphasis added). In the instant case, it cannot be disputed that much, if not all, of the "Presidential information" contained in the records designated by the Bush–Wilson Agreement as "personal records of George Bush" also qualifies as "Presidential records" under the PRA.

*Armstrong II* held that guidelines for categorizing Presidential records are subject to judicial review "to ensure that materials that are not subject to the PRA are not treated as Presidential records." *Id.* Accordingly, in turn, the Court observes that *Armstrong II* does not necessarily foreclose judicial review of a decision to denominate certain materials "personal records" of a former President.[11] Such judicial review may be available to ensure that Presidential records are not disposed of as personal records at the end of an Administration and that, instead, all Presidential records fall subject to the Archivist's "*affirmative* duty to make such records available to the public." 44 U.S.C. § 2203(f)(1) (emphasis added). Thus, the Court observes that *Armstrong I* and *Armstrong II* do not mark the beginning and end of the complicated inquiry regarding judicial review under the PRA, despite the Defendants' suggestion to the contrary.

Moreover, the materials purportedly covered by Schedules A, B and C to the Bush–Wilson Agreement may also contain federal records subject to the Federal Records Act. Indeed, while NSC backup tapes and hard drives are purportedly covered by Schedule A to the Bush–Wilson Agreement, the NSC still has not promulgated adequate guidelines for segregating Presidential records from Federal records, despite the long history of the *Armstrong* litigation. Such guidelines are subject to judicial review under *Armstrong II*, and the Agreement purportedly assigning former President Bush "exclusive

legal control" over such records cannot shield from the Court's eye the method by which such documents are categorized.

Second, as the *Armstrong I* Court noted, the PRA sets forth different provisions for the disposal of Presidential records *during* a term of office from those governing the disposal of Presidential records *after* a term of office. *Armstrong I*, 924 F.2d at 286. While the statute provides that, during a term of office, the President "*may* dispose of those of his Presidential records that no longer have administrative, historical, informational, or evidentiary value," the PRA further provides that, at the end of the President's term, the Archivist "*shall* assume responsibility for the custody, control, and preservation of, and access to, the Presidential records of that President." 44 U.S.C. § 2203(c), (f)(1) (emphasis added).

There is thus an unambiguous distinction made in the Act between an incumbent President's disposal of Presidential records while in office, and the Archivist's disposal of Presidential records following a term in office. At bottom, the Bush–Wilson Agreement on its face constitutes an opting out of the provisions of the PRA governing the Archivist's disposal of Presidential records following a term of office. These provisions, as mentioned above, are distinct from those that govern disposal of Presidential records by an incumbent President. The Defendants would nonetheless have the Court find that, because former President Bush, on his last day in office, signed an Agreement affording himself complete control over certain Presidential records following his term in office, the Agreement purportedly governing the fate of such records now that former President Bush is a private citizen is not reviewable. The Court cannot agree.

A careful reading of the *Armstrong I* and *Armstrong II* opinions demonstrates that the Court of Appeals' holdings regarding judicial review of the President's compliance with the PRA do not extend to the preservation and

---

**11.** Indeed, counsel for the Defendants have represented to this Court that "[s]ince the Presidential information at issue has *not* been designated by President Bush as 'Presidential records' under

the PRA, he retained the discretion to dispose of it as he saw fit, including through transfer to the Archivist subject to restrictions." Plaintiffs' Exh 30, *supra,* note 8 (emphasis added).

disposal provisions applicable after a President has left office. In explaining that the *Armstrong I* language regarding judicial review did not address the initial classification of existing materials as Presidential records, the Court of Appeals emphasized that "the *Armstrong I* court discusses only the 'creation, management, and disposal decisions' described in the provisions of 44 U.S.C. § 2203." *Armstrong II*, 1 F.3d at 1294. The Court goes on to describe the parameters of "creation decisions," "management decisions" and "disposal decisions" under the PRA that are immune from judicial review. Of relevance here, of course, is the scope of such "disposal decisions." Notably, the Court of Appeals explained that " 'disposal decisions' describes the process outlined in 44 U.S.C. § 2203*(c)–(e)* for disposing of Presidential records." *Id.* (emphasis added). Thus the provisions applicable to the Archivist's handling of records after a President's term of office, 44 U.S.C. § 2203*(f)*, are not covered by the *Armstrong* decisions. The likely reason for this is that the Archivist—not a former President—is charged with implementing § 2203(f) and, as explained below, her actions are subject to judicial review.

Third, the Defendants ignore the fact that the Bush–Wilson Agreement purports to give former President George Bush, now a private citizen, exclusive and *ongoing* control over the disposition of Presidential records. As discussed in Part III, nowhere in the PRA is there any provision allowing a former President to exercise control over Presidential records *after* his term in office ends. Indeed, the provisions allowing a President to place limited restrictions on access to certain categories of Presidential records require the President to specify such restrictions "*[p]rior* to the conclusion of the term of office or last consecutive term of office," affording no discretion to specify them after leaving office. 44 U.S.C. § 2204(a) (emphasis added).

If, as the Defendants maintain, judicial review of the Bush–Wilson Agreement is in no way available, judicial review of any of former President Bush's future decisions implementing the Agreement must also be unavailable. However, it borders on the absurd to posit that Congress—in passing a statute

to preclude former Presidents from disposing of Presidential records at will, and affording Presidents no discretion to restrict access to records after leaving office—intended that a former President's post-term decisions regarding disposal of such records be immune from judicial review. Under the Defendants' interpretation of the *Armstrong* holdings, however, such an infeasible result would have to follow.

Accordingly, the Court declines to hold, as the Defendants would have it, that *Armstrong I* and *Armstrong II* preclude judicial review of a document that effectively purports to supersede the clear mandates of § 2203(f) of the PRA. Such a finding would sanction any President's eleventh hour agreement that he or she, once a private citizen, would control the Archivist's disposal of Presidential records following a term in office. The PRA, however, was passed precisely in order to preclude former Presidents from disposing of Presidential records as they please, a power which the Bush–Wilson Agreement purports to afford former President Bush, notwithstanding the mandate of the PRA that the Archivist *shall* process such records under the statute. The Court therefore declines to refuse judicial review of the Archivist's compliance with the PRA's disposal provisions applicable after a President leaves office.

**B. The Archivist's Compliance with the PRA is at Issue Here and is Subject to Judicial Review**

█ As mentioned above, at issue in the instant litigation is the Archivist's compliance with the mandates of the PRA. While the *Armstrong* decisions preclude judicial review of the *President's* compliance with the PRA *during* his term in office, they did not address judicial review of the *Archivist's* compliance with her obligations under the PRA when she takes custody of Presidential records at the *conclusion* of the President's term. The *Armstrong I* holding was premised on the conclusion that "permitting judicial review of the *President's* compliance with the PRA" would upset the statutory balance because Congress sought to afford the President "virtually complete control over his rec-

ords *during his term of office.*" *Armstrong I*, 924 F.2d at 290 (emphasis added). The Court of Appeals did not address, however, the question of whether the Archivist's compliance with § 2203(f) is subject to judicial review.

■ As discussed further below, the Plaintiffs present detailed arguments to show that the Archivist's actions are subject to judicial review.[12] In response, the Defendants contend preliminarily that "[t]he President's discretionary decisions are not made subject to review merely because others in the government carry out his directions." Defendants' Motion, at 15. As the Plaintiffs observe, however, the Court of Appeals has held just the opposite, to wit, that "[t]he fact that the President may have ordered" an official to take an action "does not leave the courts without authority to review the legality" of the official's action, "for courts have power to compel subordinate executive officials to disobey illegal Presidential commands." *Soucie v. David*, 448 F.2d 1067, 1072 n. 12 (D.C.Cir. 1971). Moreover, the Plaintiffs raise a constitutional challenge here, and such challenges are reviewable notwithstanding even an express statutory provision precluding review of agency decisions. *See Johnson v. Robinson*, 415 U.S. 361, 367, 94 S.Ct. 1160, 1165–66, 39 L.Ed.2d 389 (1974).

The Defendants nonetheless contend that *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948), is "controlling precedent" to the effect that "a subordinate officer's action to implement a discretionary Presidential decision is no more subject to judicial review than the Presidential action at its core." Defendants' Motion, at 18. The Court finds, however, that the Defendants misapply *Chicago & Southern Air Lines*. The statute at issue in that case subjected any order of the Civil Aeronautics Board to judicial review, but exempted those orders implicating decisions which, under the statute, were expressly subject to the approval of the President. *Id.* at 106, 68 S.Ct. at 433–34 (referring to section 801 of the Civil Aero-

nautics Act, 49 U.S.C. § 601, which was repealed in 1958). The Court concluded that orders subject to Presidential approval were not mature for purposes of judicial review prior to Presidential approval and that, after such approval had been given, the final orders embodied Presidential discretion as to political matters beyond the purview of the courts. *Id.* at 114, 68 S.Ct. at 437–38.

Unlike in *Chicago & Southern Air Lines*, however, there is no statutory provision committing the control of Presidential records after the President's term ends to the nonreviewable discretion of the former President. Indeed, the PRA does not commit this issue to the discretion of any official, let alone a private citizen, but binds the Archivist to follow express procedures in preserving and disposing of Presidential records upon receipt of the same following a President's term in office. The reasoning of the *Chicago & Southern Air Lines* Court is instructive:

> [With § 801 of the Civil Aeronautics Act], Congress has completely inverted the usual administrative process. *Instead of acting independently of executive control*, the agency is then subordinated to it. *Instead of its order serving as a final disposition of the application*, its force is exhausted when it serves as a recommendation to the President.... Presidential control is not limited to a negative but is a positive and detailed control over the Board's decisions, unparalleled in the history of American administrative bodies.

*Id.* at 109, 68 S.Ct. at 435 (emphasis added) (citations omitted).

Here, rather than "subordinating" the Archivist to executive control, the PRA mandates that, at the end of the President's term, the Archivist "*shall* assume responsibility for the custody, control, and preservation of, and access to, the Presidential records of that President," thereby leaving virtually no discretion to the President or any other official with respect to the control and disposition of Presidential records at the end of an Administration. *See National Trea-*

---

12. Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary In-

junction, at 25–28.

*sury Employees Union v. Nixon,* 492 F.2d 587, 601–03 (D.C.Cir.1974) (statute that provides that the President "shall" take certain actions did not leave discretion to the President and is enforceable by mandamus relief). Rather, the PRA leaves open only a narrow window by which the President, before leaving office, may impose additional restrictions on particular categories of documents for a specified period of time, and the final determination of whether records fall within these narrow restrictions lies with the Archivist, not the President. 44 U.S.C. §§ 2203(f)(1), 2204(b), (c).

In addition, the Archivist may dispose of certain records only after providing notice in the Federal Register and, unlike in *Chicago & Southern Air Lines* where the Court found no opportunity for final agency action under that statutory scheme, the PRA provides that "[p]ublication of such notice shall constitute final agency action" for purposes of judicial review under the APA. *Id.* § 2203(f)(3). *Cf. Dalton v. Specter,* —— U.S. ——, ——, 114 S.Ct. 1719, 1727, 128 L.Ed.2d 497 (1994) (agency actions not reviewable because they are *not* final agency actions where statute commits decisionmaking to the discretion of the President). Here, the statute affords neither the Archivist, nor the President, nor any other official any discretion with respect to these procedures. Such was not the case in the cases relied upon by the Defendants.

Indeed, any discretion on the part of a President to control his or her records after leaving office was removed by passage of the PRA. As the Plaintiffs observe, the Defendants' interpretation of the scope of judicial review would essentially put the law back to where it was prior to 1978, when the PRA was enacted. Prior to that time, former Presidents successfully maintained that they had discretion to control their Presidential records after they left office, a control often exercised by destroying, gifting or restricting public access to such records through private agreements with public officials. *Nixon v. United States,* 978 F.2d 1269, 1277–83 (D.C.Cir.1992) (reviewing pre–1974 practices). As the Court of Appeals has explained, however, "[i]n 1978, Congress pro-spectively abolished presidential ownership of White House materials with the Presidential Records Act . . . ." *Id.* at 1277 n. 19.

The terms of the Bush–Wilson Agreement, in effect, circumvent what Congress did in 1978, as the PRA was passed in part to preclude future accords like the Nixon–Sampson Agreement. Indeed, in a brief filed with this Court in connection with the *Armstrong* litigation, the government maintained that "the authority of former President Bush protected in the Agreement" is best analogized "to the right of a former President to control Presidential materials[, a right which] lies in the historical records of former presidents transferring their papers from the White House prior to enactment of the PRA." Plaintiffs' Exh. 30, *supra* note 8, at 43, 43 n. 37 (citing *Nixon,* 978 F.2d at 1277–83). However, such a "right," if it ever existed, was abrogated by the PRA, which "terminate[d] the tradition of private ownership of Presidential papers and the reliance on volunteerism to determine the fate of their disposition." H.R. No. 95–1487, 95th Cong., 2d Sess. § 2 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5732, 5733.

■ Having found that the Archivist's implementation of the Bush–Wilson Agreement is not shielded from judicial review by virtue of the nonreviewability of an incumbent President's discretionary decisions under the PRA, the Court turns to the general question of whether the Archivist's actions under the PRA are subject to judicial review. Agency actions, such as those of the Acting Archivist, are presumptively subject to judicial review absent clear and convincing evidence that Congress intended to preclude such review. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820–21, 28 L.Ed.2d 136 (1971) (citing 5 U.S.C. § 701). *See also Bowen v. Michigan Academy of Family Physicians,* 476 U.S. 667, 670, 106 S.Ct. 2133, 2135, 90 L.Ed.2d 623 (1986) ("strong presumption that Congress intends judicial review of administrative action").

The Defendants submit that the legislative history of the PRA "reinforces the narrow scope of judicial review intended by Congress under the PRA." Defendants' Motion,

at 17. In particular, they argue that, because witnesses during a hearing before the Senate Committee on Governmental Affairs urged that Congress afford judicial review of any decision concerning official records, they must have understood that judicial review was not intended to be permitted absent an express statutory provision. *Id.* (citing Hearing on S. 3494 Before the Senate Comm. on Governmental Affairs, 95th Cong., 2d Sess. 29 (Sept. 15, 1978)).

Despite defense counsel's assertion to the contrary at oral argument, however, the Defendants' argument must assume that the basic presumption of reviewability somehow does not apply to the PRA. Rather, "judicial review of such administrative action is the rule, and nonreviewability an exception that must be demonstrated." *Barlow v. Collins,* 397 U.S. 159, 167, 90 S.Ct. 832, 837, 25 L.Ed.2d 192 (1970). Thus, "where substantial doubt about the congressional intent exists, the general presumption favoring judicial review of administrative action is controlling." *Block v. Community Nutrition Institute,* 467 U.S. 340, 351, 104 S.Ct. 2450, 2456–57, 81 L.Ed.2d 270 (1984). Here, the meager evidence proffered by the Defendants to suggest that Congress intended to prohibit judicial review of the Acting Archivist's compliance with the PRA does not even serve to create substantial doubt about congressional intent, and the presumption favoring judicial review is controlling.

Moreover, the Court finds without merit the Defendants' assertion that judicial review should not be presumed "where unique circumstances are presented not foreseen by Congress and constitutional issues are implicated." Defendants' Motion, at 20. Long-standing precedents establish just the opposite: that a "strong presumption" exists that Congress intended judicial review of agency compliance with a statute. *Bowen,* 476 U.S. at 670, 106 S.Ct. at 2135–36. This is particularly true where, as here, the statute was passed to preclude the very conduct subject to challenge, and the language mandating the Archivist's affirmative duties leaves virtually no discretion to an incumbent President (and none to a former President) to impose restrictions on the Archivist's exercise of those

duties. Thus, assuming *arguendo* that such clear exceptions to the presumption favoring judicial review exist, the Court finds them inapplicable to the present case.

Accordingly, the Court finds that the presumption of reviewability applies, and that the Archivist's compliance with the PRA is subject to judicial review.

## III. THE BUSH–WILSON AGREEMENT IS UNLAWFUL

### A. The Bush–Wilson Agreement Violates the Presidential Records Act

■ As the Court's discussion regarding judicial review suggests, the PRA places on the Archivist a duty to manage and preserve all records transferred to her custody in accordance with the PRA, a mandate which conflicts with the provisions of the Bush–Wilson Agreement purporting to assign control over such records to former President Bush. Nowhere in the Defendants' instant briefs do they contest this proposition, relying primarily on the issues of mootness and judicial review to urge judgment in her favor.

In view of the Defendants' silence on the merits, the Court could treat the Plaintiffs' arguments as conceded. *See* Local Rule 108(b). In any event, however, without any showing by the Defendants to the contrary, the Court finds that the Agreement on its face conflicts with the PRA. At oral argument, when pressed, counsel for the Defendants conceded that the Agreement was "unartfully" drafted and subject to nullification to the extent that it conflicts with the PRA. Tr. at 14. The Court's colloquy with counsel regarding the latter issue bears repeating:

> MR. LEPLEY: ... Anything that is a presidential record, anything that is protected by statute, is going to be protected by statute, and that is what the archivist has stated, and what President Bush has acceded to.
>
> THE COURT: To the extent that the president in the agreement does not provide for that, it is invalid. You would agree to that, wouldn't you?

MR. LEPLEY: Well, I am not sure, but what I think that the court said was that to the extent that the archivist would try to violate the Presidential Records Act at the instruction of former President Bush, that would be invalid, and I would agree with that, Your Honor.

THE COURT: All right. And to the extent that the agreement itself is contrary to the Presidential Records Act, it is also invalid, is it not?

MR. LEPLEY: That is right. The president could not simply write a statute out of existence at his whim, which is what that would be tantamount to. But that is clearly not the situation here.....

THE COURT: [The Archivist] is only bound by the Presidential Records Act in the performance of her duties, is she not?

MR. LEPLEY: Yes, Your Honor, she is. I would agree with that.

THE COURT: And she is not bound by any terms and conditions set forth in this so-called Bush–Wilson agreement, is she? Because—is that right?

MR. LEPLEY: Well, she is not bound by it.

THE COURT: And to the extent that [the Agreement] is contrary to the Presidential Records Act, that is void.

MR. LEPLEY: If it were contrary to the Presidential Records Act, that is void.

Tr. at 44–46.

As in the papers, defense counsel failed to provide any argument at the hearing to refute the Plaintiffs' contention that the Bush–Wilson Agreement violates the PRA. Thus, the Court finds that the Bush–Wilson Agreement on its face conflicts with the PRA. As the Defendants effectively concede, for that reason alone, the Agreement must be declared null and void. Indeed, to hold otherwise would be to find that an Agreement between the President and certain officials of the Executive Branch, signed on the last day of an Administration, may supersede an Act of Congress; such a notion, of course, is insupportable. Rather, no one—not even a President—is above the law. *See United States v. Nixon*, 418 U.S. 683, 706, 94 S.Ct.

3090, 3106, 41 L.Ed.2d 1039 (1974) ("[N]either the doctrine of separation of powers, nor the need for confidentiality of high-level communications, without more, can sustain an absolute, unqualified Presidential privilege of immunity from judicial process under all circumstances.").

In particular, the Court finds that the Bush–Wilson Agreement violates the PRA in three respects. First, the PRA directs that the "United States shall reserve and retain *complete* ownership, possession and control of Presidential records." 44 U.S.C. § 2202 (emphasis added). The provision leaves no room for any government official to enter into agreements conferring ownership or control of Presidential records to any person or entity other than the United States. Despite this unequivocal language, however, the Bush–Wilson Agreement provides that former President Bush shall retain "exclusive legal control of all Presidential Information on the materials." Exh. A. at 2, I.5. The Agreement also provides that materials identified in Schedule C, the hard disks used by personnel of the White House Office and the Office of Policy Development, including the Presidential records in those materials, shall be transferred to the NARA as "personal records of George Bush" at the conclusion of the Independent Counsel's investigation, even though few, if any, of these records qualify as "personal records" under the PRA. *Id.* at I.7. 44 U.S.C. § 2201(3). And as "Presidential records," these materials are strictly United States property under the PRA. 44 U.S.C. § 2202.

Second, while the Agreement purports to give former President Bush "exclusive legal control" of the materials at issue, the PRA mandates that the Archivist assume control of Presidential records, and that she "make such records available to the public as rapidly and completely as possible consistent with the provisions of the Act." 44 U.S.C. § 2203(f)(1). The Agreement violates this directive by purporting to allow former President Bush to control access to "Presidential information," and by labelling materials that are "Presidential records" under the statute as personal records of George Bush.

Third, the Agreement violates the PRA's requirement that, once Presidential records

are transferred to the Archivist at the end of an administration, they may be removed or destroyed only if the Archivist determines that they have insufficient value to warrant continued preservation, and only after publication of notice in the Federal Register at least 60 days in advance of the proposed disposition. *Id.* § 2203(f)(3). The Bush–Wilson Agreement, in contrast, provides that Presidential information on the materials shall be disposed of "in accordance with instructions of George Bush," without any restriction on former President Bush's ability to order the materials destroyed or removed, without any notice to the public. Exh. A at 4, III.3.

Accordingly, the Court finds that the Bush–Wilson Agreement violates the PRA must be declared null and void. Critically, the Defendants fail to provide a shred of argument to the contrary; indeed, their counsel concedes that, to the extent that the Agreement conflicts with the PRA, it is null and void. Thus, the Court's conclusion on the merits is inevitable.

**B. The Former Archivist's Decision to Enter into the Agreement Notwithstanding the PRA was Arbitrary, Capricious, an Abuse of Discretion, and Contrary to Law**

■ Moreover, nothing in the statute authorizes the Archivist to enter into agreements to create special rules for disposition of the records of a particular Presidential administration, particularly where such agreements conflict with the provisions of the PRA. "[A]n agency's power is no greater than that delegated to it by Congress." *Lyng v. Payne*, 476 U.S. 926, 937, 106 S.Ct. 2333, 2341, 90 L.Ed.2d 921 (1986). Indeed, while another statutory provision allows the Archivist to "accept for deposit ... the papers and other historical materials of a President or former President of the United States ... subject to restrictions agreeable to the Archivist as to their use," the same provision expressly provides that "[t]his section shall *not* apply to any Presidential records which are subject to the provisions of chapter 22 of this title." 44 U.S.C. § 2111 (emphasis added).

Moreover, the Court observes that former Archivist Wilson stated that he "had no role

in the negotiations . . . in drawing up the multi-party agreement," and that he signed it with the understanding "that no rights were given to the former President that are not already in existence under current law, including the Presidential Records Act." Plaintiffs' Exh. 7 (Statement of the Archivist of the United States (Feb. 17, 1993)). Even the Defendants do not argue, however, that the Bush–Wilson Agreement affords the former President no rights in addition to those provided by the PRA; indeed, the Agreement gives extraordinary rights to former President Bush. In deciding whether an agency determination passes muster under the APA, "the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. at 416, 91 S.Ct. at 823–24. It appearing that Mr. Wilson's decision to enter into the Agreement, aside from being outside "the scope of [his] authority and discretion," *id.* at 415–16, 91 S.Ct. at 823, was based on an erroneous view of the law, the Court finds that the Bush–Wilson Agreement was arbitrary, capricious, an abuse of discretion, and contrary to law, in violation of 5 U.S.C. § 706(2)(A). *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405, 110 S.Ct. 2447, 2460–61, 110 L.Ed.2d 359 (1990) (district court action based on erroneous view of the law necessarily constitutes an abuse of discretion). The Court shall therefore declare the Agreement null and void, and enjoin the Acting Archivist from implementing its provisions.

**C. The Bush–Wilson Agreement Conflicts with Article II of the Constitution**

■ Finally, the Court determines that the Bush–Wilson Agreement conflicts with Article II of the Constitution because in the Agreement, the former Archivist contracts to give former President Bush, now a private citizen, authority to direct the former Archivist's actions and those of his successors, while Article II of the Constitution vests in the incumbent President the authority to direct the actions of current Executive officials. The Court is confident that President Clinton is aware of his duty under Article II, § 3 of

the Constitution, which provides that *"he shall take care that the laws be faithfully executed...."* The Bush–Wilson Agreement, purporting to give such power to former President Bush, is totally contrary to President Clinton's constitutional responsibility and duty.

In *Public Citizen v. Burke,* 843 F.2d 1473 (D.C.Cir.1988), the Court of Appeals made clear that the incumbent President, not the former President, "is the constitutional superior of the Archivist," with the constitutional power to direct the Archivist. *Id.* at 1478. Accordingly, because former President Bush has no constitutional authority to direct the actions of the Archivist, as that authority properly belongs to President Clinton, the Bush–Wilson Agreement purporting to make the Archivist's control and disposition subject to former President Bush's direction conflicts with Article II of the Constitution.

*Burke* involved a challenge to the Archivist's publication of regulations governing disclosure of former President Nixon's materials. The Department of Justice opined that they must be "interpreted" for constitutional reasons as requiring the Archivist to acquiesce in any claim of executive privilege asserted by Mr. Nixon to block disclosure of the materials. The Archivist adopted that interpretation, but the Court of Appeals held that there was no constitutional requirement that the Archivist comply with a former President's claim of executive privilege to preclude disclosure of the records. *Id.* at 1478–79.

The Court explained, "since the incumbent President is not constitutionally obliged to honor former President Nixon's invocation of executive privilege with respect to the Nixon papers, we see no reason why the Archivist—an appointee of the incumbent President—is himself constitutionally compelled to afford any more deference to Mr. Nixon's claim than would be the incumbent President." *Id.* at 1479. Accordingly, the Court held that the "Archivist's regulations, as interpreted ... rely on an erroneous construction of the Constitution and therefore cannot be sustained." *Id.* at 1480.

Under *Burke* and Article II of the Constitution, the Acting Archivist is subject to the direction of President Clinton, and former President Bush has no "constitutional power to direct the Archivist." *Id.* at 1478. Under the terms of the Bush–Wilson Agreement, however, which former Archivist Wilson signed, former President Bush is purportedly empowered to direct the Archivist's disposition of Presidential information on the back-up tapes and to oversee decisions by NARA concerning access to information on the materials. Exh. A, at 4, 2–3. "If, whenever [a former President] asserts executive privilege, the Archivist in effect loses jurisdiction over his responsibilities to affect disclosure, [then] the former President has gained power to withdraw from the Archivist some indefinite portion of the responsibilities that Congress delegated to him," and place that power outside the Executive branch. *Id.* at 1480. With this untenable result in mind, this Court, as in *Burke,* finds that such an Agreement cannot be sustained under the Constitution.

 As with the Plaintiffs' statutory claim, the Defendants offer no argument on the merits, but assert that no cause of action exists for private parties such as the Plaintiffs to raise the constitutional claim. The APA, however, explicitly establishes a cause of action for private parties seeking judicial review of agency action, including review of whether such action is "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B). Moreover, "[a] separate indication of congressional intent to make agency action reviewable under the APA is not necessary; instead, the rule is that the cause of action for review of such action is available absent some clear and convincing evidence of legislative intention to preclude review." *Japan Whaling Ass'n v. American Cetacean Society,* 478 U.S. 221, 230 n. 4, 106 S.Ct. 2860, 2866 n. 4, 92 L.Ed.2d 166 (1986).

The Defendants argue that, under *Franklin v. Massachusetts,* —— U.S. ——, ——, 112 S.Ct. 2767, 2775, 120 L.Ed.2d 636 (1992), the President is not subject to the Administrative Procedure Act. The former Archivist's actions, however, are subject to review under the APA and, as the Court of Appeals held in *Burke,* the current Archivist cannot be compelled under the Constitution to follow the direction of a former President when the incumbent President "is the constitutional superior of the Archivist." *Burke,* 843 F.2d

at 1478. *Burke* represents an instance where private citizens successfully challenged the constitutionality of a regulation that made certain decisions of the Archivist subject to the direction of a former President. Similarly, the Plaintiffs assert here under the APA that an Agreement purporting to render the Archivist's control and disposition of Presidential records subject to the direction of the former President is unconstitutional. In light of *Burke,* the Court sees no reason why the instant Plaintiffs fail to state a constitutional cause of action. Accordingly, the Court finds without merit the Defendants' contention that the Plaintiffs' constitutional claim must be dismissed on that ground.

### CONCLUSION

For the foregoing reasons, the Court finds that the Bush–Wilson Agreement is inconsistent with the Presidential Records Act and Article II of the Constitution, and that the decision by the Archivist to enter into that Agreement notwithstanding the provisions of the PRA was arbitrary, capricious, an abuse of discretion, and contrary to law. The Court shall therefore declare said Agreement null and void and shall enjoin the Acting Archivist from implementing the Bush–Wilson Agreement. Further, the Acting Archivist is hereby directed to process the materials listed in Schedules A, B and C to the Bush–Wilson Agreement in accordance with the provisions of the Presidential Records Act. The Court shall issue an Order of even date herewith consistent with this Memorandum Opinion.

### ORDER

For the reasons articulated in the Court's Memorandum Opinion issued of even date herewith, it is, by the Court, this 25 day of February, 1995,

ORDERED that the Plaintiff's Motion for Summary Judgment shall be, and hereby is, GRANTED; and it is

FURTHER ORDERED that the Defendants' Motion to Dismiss or, in the alternative, Motion for Summary Judgment, shall be, and hereby is, DENIED; and it is

FURTHER ORDERED that the Court declares that the January 20, 1993 "Memorandum of Agreement Between the National Archives and Record Administration And National Security Counsel And Office of Administration and George Bush" ("Memorandum of Agreement") is null and void; and it is

FURTHER ORDERED that the Defendant Acting Archivist, her agents, employees, and contractors, are enjoined from implementing the Memorandum of Agreement; and it is

FURTHER ORDERED that the Defendant Acting Archivist, her agents, employees, and contractors, shall retain custody of, control, preserve, and provide access to the backup tapes and hard drives identified in the Memorandum of Agreement, including hard drives deposited with the National Archives and Records Administration at the conclusion of the Independent Counsel's investigation, in accordance with the Presidential Records Act and the Federal Records Act; and it is

FURTHER ORDERED that the defendant Acting Archivist, her agents, employees, and contractors shall ensure that all persons having access to the materials identified in the Memorandum of Agreement have notice of this Order; and it is

FURTHER ORDERED that, by virtue of the final judgment entered herein, and in view of the fact that the Defendants have not had an opportunity to respond to the Plaintiffs' Motion to Compel, the Plaintiffs' Motion to Compel shall be, and hereby is, declared MOOT.

### EXHIBIT A

Memorandum of Agreement

Between

National Archives and Record Administration

And

National Security Council

And

Office of Administration

And

George Bush

Whereas, the court in *Armstrong v. Executive Office of the President,* et al., (C.A. No.

89–0142, CRR) ("the lawsuit"), has ordered the Executive Office of the President to preserve certain computer backup tapes and other electronic materials; and

Whereas, the Bush Administration ends at 12:00 noon on January 20, 1993, and the parties to this agreement desire to designate an appropriate repository to preserve these materials, as well as other electronic materials potentially relevant to various ongoing investigations, and to establish procedures governing the information contained on these materials until the conclusion of such lawsuit and investigations;

Now therefore, the parties agree that the following terms, conditions, provisions and understandings shall govern the custody, control, storage, access and disposition, and access to the information contained on the materials listed at Schedules A, B and C.

I. *Transfer of Materials*

1. On or before 12:00 noon, January 20, 1993, all materials listed at Schedules A, B and C ("the materials") shall be transferred by the Office of Administration ("OA") and the National Security Council ("NSC") to the physical custody of the National Archives and Records Administration ("NARA") for storage in an appropriate NARA facility.

2. Prior to transfer, OA and the NSC will clearly label each tape externally with volume and serial numbers, note the date of creation of the tape (if known), mark the materials with the appropriate security classification levels, or otherwise label the materials appropriately.

3. Upon transfer, NARA will be provided all technical manuals and/or other available information, including systems information, for operation or reading of the materials and the name, title, employer, and phone number of a systems administrator for each system affected by the transfer by OA and NSC.

4. Upon transfer, OA and NSC shall provide NARA with an inventory of the materials and NARA shall execute proper documentation for receipt of these materials.

5. George Bush shall retain exclusive legal control of all Presidential information, and all derivative information in whatever form, contained on the materials.

6. The originating agency shall retain legal control of all agency information, and all derivative information in whatever form, contained on the materials.

7. Except to the extent necessary to effectuate other provisions of this Agreement, the NSC (in the case of materials listed in Schedule A) and OA (in the case of materials listed in Schedule B) shall retain legal control of the materials themselves. At the conclusion of the investigation described in paragraph V.6., materials in Schedule C shall be transferred to NARA as personal records of George Bush.

8. NARA shall keep the other parties informed at all times of the location of the materials, and shall notify, by certified mail or equivalent procedure, the other parties in writing at least 10 days before moving any of the materials.

II. *Access to Information on the Materials*

1. Except as provided below, access to the materials, and the information contained on the materials, shall be granted only pursuant to a lawful subpoena, court order, or request by an independent counsel appointed under federal law.

2. Before granting access to any of the materials (or the information contained thereon) NARA shall notify the other parties to this Agreement (or their designated representatives), by certified mail or equivalent procedure, at least 10 days before such access is to occur.

3. NARA shall maintain and provide access to these materials only in accordance with procedures, including proper security clearance and log-in, log-out procedures, appropriate for classified materials.

4. Subject to the exceptions listed in subparagraph II.4.c., NARA shall segregate Presidential from non-Presidential information before providing access to NSC, OA, or any third party to any non-Presidential information contained on the materials.

a. NARA shall perform such segregation pursuant to procedures approved in advance by the other parties. Such procedures shall include a provision by which NARA performs an initial review of the materials (or the responsive portions thereof), identifies Presidential materials, then permits George Bush or his designee to review the materials to ensure that all Presidential materials have been properly identified by NARA.

b. Any segregation under this agreement shall be accomplished in a manner designed to ensure preservation of the information contained on the materials.

c. The provisions of this paragraph regarding segregation by NARA shall not apply:

(i) in the case of a subpoena or court order requiring access to Presidential information;

(ii) to the extent precluded by any court order;

(iii) in the case of any request for information by an independent counsel appointed under federal law; or

(iv) whenever the parties agree to waive these requirements in a particular case.

5. In the event of a system failure in OA or NSC prior to February 1, 1993, requiring the use of backup tapes to restore NSC or OA computer systems, and notwithstanding paragraphs II.1 and II.2, NSC or OA shall be provided copies of the Bush Administration backup tapes created on January 19, 1993, for the sole purpose of performing such restoration. OA or NSC shall return such tapes to NARA no later than February 2, 1993, and shall not copy or otherwise reproduce the information contained thereon beyond that necessary to effect a system restoration.

6. George Bush and his designees shall have unconditional and unlimited access to all information contained on the materials, other than that information for which such access is prohibited by law.

7. The parties shall agree upon procedures to provide NSC and OA access to agency information contained on the materials for the purpose of conducting ongoing agency business. Such procedures need not include transfer of any materials back to OA or NSC.

III. *Disposition of the Materials and Information Contained on the Materials*

1. All materials and information thereon shall be preserved until after the conclusion of the lawsuit as well as any law enforcement investigation and any congressional investigation in which the investigator has made a lawful demand for access to information on the materials.

2. Thereafter, all agency information on the materials shall be disposed of in accordance with instructions from NSC, OA, and any interested originating agency, or, if the information is ultimately determined to be a record, pursuant to a proper records schedule.

3. Similarly, Presidential information on the materials shall be disposed of in accordance with instructions of George Bush or his designee.

4. Finally, the materials themselves (as opposed to the information contained on the materials) shall be disposed of by agreement between the parties (other than NARA), and shall remain in the custody of NARA until such agreement is reached.

IV. *Costs*

1. NARA will be responsible for the costs of storing and preserving the materials.

2. Costs, if any, of any segregation pursuant to paragraph II.4 of this Agreement shall be allocated by future agreement between NARA and NSC (with respect to materials listed at Schedule A) and between NARA and OA (with respect to materials listed at Schedule B).

3. NSC or OA, as appropriate, will bear the costs of any search (as opposed to segregation under paragraph II.4) performed by NARA for agency information pursuant to a subpoena, court order, or request by law enforcement authorities properly directed to NSC or OA.

V. *Reservations*

1. Nothing in this agreement shall be construed to waive or limit any rights and

privileges of, or other protection provided to, George Bush by the Constitution of the United States, statute, or other law.

2. George Bush reserves the right to intervene in any lawsuit or other matter concerning the materials.

3. This agreement is subject to Executive Order 12356 of April 2, 1982, any successor executive order, and any other applicable law governing classified information.

4. Nothing in this Agreement shall be construed as extinguishing, or conferring, any rights of any person under the Freedom of Information Act, 5 U.S.C. 552 *et seq.*

5. Nothing in this Agreement shall be construed as disputing, or conceding, that any materials or information subject to this Agreement constitute "federal records" for purposes of the Federal Records Act, 44 U.S.C. 3301, or as in any way suggesting that any materials listed in Schedule C are subject to any injunction entered to date in the lawsuit.

6. During the pendency of the investigation by the independent counsel established by order of the Special Division of the U.S. Court of Appeals for the District of Columbia Circuit in matter No. PN 92–5, the agreement attached as Schedule D shall govern the retention of and access to the materials, and shall supersede any provision of this agreement to the extent of any inconsistency.

## VI. *Additional Definitions*

1. "Presidential information" means information, contained on the materials, that was created or received by the President, any individual or unit in the Executive Office of the President (including, but not limited to, all staff of the White House Office and the Office of Policy Development) whose sole function is to advise and assist the President, and/or the NSC staff in their functions as advisers and assistants to the President.

2. "Agency information" means information contained on the materials that was created or received by officials or employees of federal agencies within the Executive Office of the President in the course of performing their functions and work on behalf of their agencies.

3. "Originating agency" means the agency within the Executive Office of the President that created particular information contained on the materials.

Signed this 20 day of January, 1993, at Washington, D.C.

/s/ George Bush

George Bush

/s/ William F. Sittmann

William F. Sittmann

Executive Secretary

National Security Council

/s/ Don W. Wilson

Don W. Wilson

Archivist of the United States

/s/ Phillip D. Larsen

Phillip D. Larsen

Acting Director

Office of Administration

### Schedule A

Materials currently in the custody of the National Security Council (NSC) to be transferred to the Archivist:

1. all Bush Administration NSC WHCA PROFS and WHCA VAX A–1 systems backup tapes in existence as of 12:00 p.m. on January 20, 1993;

2. all Bush Administration NSC WHSSS system backup tapes in existence as of 12:00 p.m. on January 20, 1993; and

3. all Bush Administration White House Situation Room "live" computer and communications systems backup tapes in existence as of 12:00 p.m. on January 20, 1993;

4. hard disks used in NSC staff personal computers at individual staff workstations during the Bush Administration and accompanying computer equipment.

*Schedule B*

Materials currently in the custody of the Office of Administration (OA) to be transferred to the Archivist:

all OA All–In–One on OASIS backup tapes existing as of 12:00 p.m. on January 20, 1993.

*Schedule C*

Materials currently in the custody of NSC and OA, and not subject to any injunction in the lawsuit:

hard disks used by personnel of the White House Office and the Office of Policy Development during the Bush Administration;

SCHEDULE D

# OFFICE OF INDEPENDENT COUNSEL

1200 New Hampshire Avenue, NW (Suite 200)
Washington, DC 20036-6889

202/463-4343

January 19, 1993

The Honorable C. Boyden Gray
Counsel to the President
The White House
Washington, D.C.

Dear Mr. Gray:

This letter memorializes the agreement reached today between representatives of our respective offices concerning the disposition of certain materials responsive to the grand jury subpoena served on The White House on January 15, 1993. The purpose of this agreement is to establish procedures that will satisfy compliance with the subpoena with respect to the categories of documents referenced herein. This agreement supersedes any other agreement between The White House and any other third party, including other government agencies, concerning the disposition of the materials referenced herein.

As you are aware, the contents of and access to materials produced pursuant to a grand jury subpoena are governed by grand jury secrecy provisions of Federal Rule of Criminal Procedure 6(e). The provisions of this agreement have been designed to accomplish the goals of continued access to these materials by the grand jury, the needs of the Bush Administration to remove the materials from the premises of the White House by 12:00 noon on January 20, 1993, and the requirements of Rule 6(e). I set forth below the various categories of materials that are covered by this agreement.

1. **Paper Documents**

The Office of Independent Counsel (OIC) has been advised by your representatives that approximately 10,000 boxes of

[18999-0001/DA930190.005]

1328

The Honorable C. Boyden Gray
January 19, 1993
Page 2

paper documents have been shipped or are being shipped to
College Station, Texas for President Bush's library. The
White House agrees to provide immediately to the OIC the
inventory of the contents of these boxes. The OIC understands
and agrees that access to these documents will require that
attorneys on the OIC staff or agents of the Federal Bureau of
Investigation travel to the presidential library in Texas.

2. Computer Materials

 a. Personal Computer Hard-Drives

 The subpoena requires production of certain material
maintained on the hard drives of personal computers used by
various White House personnel. The OIC has identified certain
White House staff members whose computer material is desired
on a priority basis. In response the White House Office of
Administration advised the OIC that it will immediately
replace hard drives in computers used by those persons and
immediately turn over the current hard drives to the OIC.
These hard drives will be maintained in the custody of the
FBI.

 Hard drives from computers of persons not specifically
identified by the OIC shall be "restored" to their original
condition using available computer software and the
information shall be duplicated onto floppy disks and provided
to the OIC. To the extent that this restoration and
duplication cannot be accomplished by January 20, 1993, these
computers containing these hard drives shall be sequestered or
the hard drives from these computers shall also be removed and
provided to the OIC.

 b. Computer Back Up Tapes of Electronic Mail
 ("E-Mail")

 It is our understanding that "back up tapes" of E-Mail
communications are maintained by the Office of Administration
on mini-computers. It is also our understanding that these
tapes are presently designated for storage at the National
Archives and Records Administration (NARA) facility. The OIC
agrees to this procedure on the following conditions:

 (1) Boxes containing these tapes are sealed in a fashion
 that any attempt to open a box is readily apparent;

The Honorable C. Boyden Gray
January 19, 1993
Page 3

 (2) Such boxes shall be segregated from all other
 materials sent to NARA;

 (3) Except for members of the staff of the OIC and
 investigative agents working on behalf of the OIC,
 no person or entity shall have access to the boxes
 except by a lawfully issued order signed by a judge
 after notice to the OIC. Members of the OIC staff
 and agents working on behalf of the OIC shall have
 immediate and continuing access to these tapes
 during reasonable business hours.

 c. **Mainframe Materials**

Because it is not entirely clear what material is maintained on the mainframe computer, it is agreed that subject to further discussions (to be held before 12:00 noon on January 20, 1993) the mainframe materials will be handled pursuant to the provisions in section 2b pertaining to the E-mail back-up tapes.

I would appreciate your signing and dating this letter and returning the original to me as soon as possible.

I appreciate your cooperation in this matter and that of your staff.

 Very truly yours,

 Joseph E. diGenova
 Independent Counsel

JED:slh

SEEN AND AGREED:

_____
C. Boyden Gray
Counsel to the President

January 19, 1993

{18999-0001/DA930190.035}

1330

## National Archives

January 27, 1995

Mr. James W. Cicconi
Akin, Gump, Strauss, Hauer & Feld
1333 New Hampshire Avenue NW
6th Floor
Washington, D.C. 20036

Dear Mr. Cicconi:

As you are aware, questions have been raised in American Historical Association v. Peterson, No. 94-2671 (D.D.C.) ("AHA"), regarding the Archivist's handling of certain materials that were created during the administration of President George Bush, and that were transferred to the National Archives and Records Administration (NARA) at the end of his administration or that are to be transferred in the future. These materials consist of backup tapes and hard disks that are more specifically described in Schedules A, B and C to a January 19, 1993 Memorandum of Agreement between the National Archives and National Security Council and Office of Administration and George Bush. This letter is to confirm my understanding of President Bush's intention that the National Archives treat these materials in accordance with the provisions of the Presidential Records Act of 1978, 44 U.S.C. §§ 2201-2207.

The materials in Schedules A, B and C contain both "Presidential records," as defined in the Presidential Records Act, 44 U.S.C. § 2201(2), and "federal records," as defined in the Federal Records Act, 44 U.S.C. § 3301. Consistent with decisions in Armstrong v. Executive Office of the President and based upon conversations between you, acting as President Bush's representative, and representatives of NARA, NARA proposes to review and process these materials as follows:

1. Certain backup tapes and hard disks identified in Schedules A and B of the Memorandum of Agreement that are in NARA's custody will be restored and copied to a format appropriate for accessioning by NARA. Once that is done, NARA will undertake, in accordance with representations made in Armstrong v. Executive Office of the President, to identify what information constitutes federal records. See 44 U.S.C. § 3301. In the course of that process, NARA employees familiar with the Presidential Records Act will also identify what non-federal information constitutes Presidential records. See 44 U.S.C. § 2201(2). Such records will be processed and reviewed by NARA in accordance with that statute, in the same manner as other Bush Administration Presidential records.

2. The materials identified in Schedule C of the Memorandum of Agreement are still in the custody of the Office of Independent Counsel Joseph E. diGenova. When these materials are transferred to the National Archives at the conclusion of the Independent Counsel's investigation, NARA employees will undertake the same review and segregation process outlined in paragraph 1 above.

3. The Presidential records that are identified in the course of the above-described review process will be preserved in NARA's custody in the same manner as are other Bush Administration Presidential records. In addition, any Presidential records on the backup tapes and hard disks identified in Schedules A and B of the Memorandum of Agreement and not covered by paragraph 1 above will be appraised and NARA will preserve or dispose of them in accordance with the Presidential Records Act. See 44 U.S.C. § 2203(3).

4. Bush Administration Presidential records that are extracted from any of the foregoing will be made available to the public in accordance with the Presidential Records Act. See 44 U.S.C. § 2204. President Bush previously advised the Archivist of his restriction specifications in his letter dated October 3, 1989; these restriction categories will be applied in consultation with the former President. See 44 U.S.C. § 2204(1) and (3).

5. Before any of these Presidential records are released to the public, the incumbent and former Presidents will be notified and will have a right to claim privilege in accordance with the provisions of the Presidential Records Act, 44 U.S.C. § 2206(3), NARA's implementing regulations, 36 C.F.R. § 1270.46, and Executive Order 12667.

Sincerely,

TRUDY HUSKAMP PETERSON
Acting Archivist
of the United States

AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P.
ATTORNEYS AT LAW

DALLAS, TEXAS
AUSTIN, TEXAS
SAN ANTONIO, TEXAS
HOUSTON, TEXAS
NEW YORK, NEW YORK

A REGISTERED LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS
1333 NEW HAMPSHIRE AVENUE, N.W.
SUITE 400
WASHINGTON, D.C 20036
(202) 887-4000
FAX (202) 887-4288

BRUSSELS, BELGIUM
MOSCOW, RUSSIA

WRITER'S DIRECT DIAL NUMBER (202) 887-__4004__

January 30, 1995

The Honorable Trudy Huskamp Peterson
Acting Archivist of the United States
National Archives & Records Administration
7th St. & Pennsylvania Ave., N.W.
Washington, DC 20480

Dear Trudy:

Thank you for your letter of January 27, 1995 regarding certain materials created during the administration of President George Bush, which are described more specifically in Schedules A, B and C to the January 19, 1993 Memorandum of Agreement between the National Archives and Records Administration, the National Security Council, the Office of Administration and the President of the United States.

I have reviewed your letter in my capacity as President Bush's designated representative under the Presidential Records Act, and find the proposed procedures outlined therein for the review and processing of such materials to be consistent with our recent discussions and with the intentions of President Bush. Accordingly, this letter constitutes agreement that such procedures may be implemented by the National Archives and Records Administration with respect to the above-designated materials, consistent with decisions in Armstrong v. Executive Office of the President and with the Presidential Records Act.

Sincerely,

James W. Cicconi